1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   BERSTER TECHNOLOGIES, LLC,

11            Plaintiff,                    Civ. No. S-11-1541 KJM JFM
          vs.

12   COY CHRISTMAS, et al.,                 ORDER

13            Defendants.

14   _____/

15          This case was on the court's calendar on December 14, 2011 for argument on

16   plaintiff's motion for a preliminary injunction and sanctions, and for plaintiff's motion for

17   reconsideration of the magistrate judge's order of October 3, 2011 denying sanctions for

18   discovery non-compliance.  Paul Andre and Yuridia Caire, King and Spalding LLP, appeared for

19   defendants; Scott Pink, Daniel Croxall and Rajiv Dharnidharka, DLA Piper LLP, appeared for

20   plaintiff.  As explained below, the court grants plaintiff's motion for a preliminary injunction and

21   denies the motion for sanctions and for reconsideration.

22   I.  Background

23          A. Claims and Pending Motion

24          Plaintiff Berster Technologies, LLC, which operates under the business name of

25   Chip Connect, filed its motion for injunctive relief while defendants' motion to dismiss the first

26   amended complaint was pending.  After the court resolved the motion to dismiss, it set the

1

1    instant motion for hearing.  Before the hearing, plaintiff filed a second amended complaint

2    (SAC), which raises eleven claims: (1) breach of express contract against Christmas and

3    Calibur11; (2) breach of partnership agreement and implied in fact contract against Christmas

4    and Calibur11; (3) fraud against Christmas, BGRMods and Calibur11; (4) breach of fiduciary

5    duty against Christmas; (5) breach of contract against BGRMods and Christmas; (6) copyright

6    infringement against all defendants; (7) misappropriation of trade secrets against Christmas,

7    BGRMods and Calibur11; (8) rescission of assignment of patent against Christmas and

8    Calibur11; (9) conversion against all defendants; (10) declaratory relief against all defendants;

9    and (11) accounting against Christmas and Calibur 11.  ECF No. 101.

10         Plaintiff argues it is likely to prevail on the merits of five claims in the complaint:

11    that Christmas breached his fiduciary duty to plaintiff (claim 4); that BGRMods and Christmas

12    breached the BGR agreement (claim 5); that defendants are infringing plaintiff's copyrights in

13    Intensafire, MLG [Major League Gaming] Game Vault, and Epic Games' Gears of War 3 Game

14    Vault (claim 6); that defendants are misappropriating plaintiff's trade secrets (claim 7); and that

15    defendants have converted plaintiff's property (claim 9).  Plaintiff asks the court to order the

16    following: that defendants refrain from using, copying, reproducing and distributing the

17    flexboard and computer code for all versions of Intensafire, the circuit board design and

18    computer code for MLG Game Vault, the circuit board design and computer code for Gears of

19    War 3 Game Vault and any and all design features of the Game Vault Products provided by

20    plaintiff; that defendants refrain from representing that they are the creators of Chip Connect

21    technology; that they refrain from any other activity constituting infringements of the copyrights

22    for the Intensafire, MLG Game Vault and Gears of War Game Vault, including software covered

23    by copyright registrations TX 7-364-435, TXu 1-739-688, TX 7-376-632; and finally that

24    defendants return all of plaintiff's confidential information.  ECF No. 64.

25    /////

26    /////

B. Additional Exhibits Provided At Hearing

At the hearing on the motion, plaintiff's counsel offered additional exhibits in support of its claims that defendants have attempted to reverse engineer the Intensafire code and that Christmas never intended to honor his commitments to make plaintiff's employee Steven Frazier and thus plaintiff part of Calibur11.  The court allowed the parties to provide supplemental briefing on the significance of this material.  Plaintiff provided three additional declarations with its supplemental briefing; defendant objects that these are outside the scope of the court's request, are impermissible amendments to earlier declarations and contain multiple layers of hearsay.  ECF No. 116.  Plaintiff responds that it submitted declarations in support of the factual assertions in its supplemental brief, the declarations explain the late production of the information, and the brief is responsive to the court's concerns expressed at the hearing.  According to plaintiff's counsel, he did not provide the documents earlier because they had been designated Highly Confidential–Attorneys' Eyes Only and he could not discuss their significance with his client until the time for filing defendants' request to maintain confidentiality had passed.  ECF No. 114-1 ¶¶ 2-6; *see generally* ECF No. 99 (protective order).

Defendants argue they have not waived the confidentiality of the documents, which should be maintained.  They then argue that some of emails concerning Calibur11, Bates-stamped C011541-1-2 and C011608, support their claims and that the remaining Calibur11 documents, C011658-1, C011752-1 and C011798, are not relevant.  They also contend that the documents related to Intensafire do not support plaintiff's claim that defendants were seeking to clone Intensafire in China.  ECF No. 115.[1]

---

[1]  Defendants suggest that had plaintiff earlier presented the documents suggesting they were attempting to clone Intensafire in China, "defendants could have provided overwhelming evidence that its version of the IntensaFIRE boards . . . was independently coded by an individual in England."  ECF No. 115 at 3.  Despite this claim, they have not requested the opportunity to provide this information in connection with the supplemental brief.  In addition, the subject of Chinese cloning of Intensafire was raised in Frazier's original declaration.  *See* ECF No. 57 ¶ 12. Defendants could have provided the information they claim to have in their original response to Frazier's and Tarnovsky's declarations.

1    The court declines to consider the materials plaintiff provided at hearing or any of

2    the declarations submitted with its supplemental briefing.  As defendants noted at hearing, there

3    is a motion to maintain confidentiality in addition to a new motion for sanctions pending in front

4    of the magistrate judge, who is by now familiar with the parties' many discovery disputes.  *See*

5    ECF Nos. 37, 102-103 (pending motions); ECF Nos. 37, 78 (discovery orders).  The court leaves

6    the resolution of these motions in his capable hands, without presuming any particular result.

7    II.  Motion For  A Preliminary Injunction

8        A.  Standards

9        As provided by Federal Rule of Civil Procedure 65 a court may issue a

10   preliminary injunction to preserve the relative position of the parties pending a trial on the

11   merits.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  The party seeking

12   injunctive relief must show that "he is likely to succeed on the merits, that he is likely to suffer

13   irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

14   and that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council,*

15   *Inc.*, 555 U.S. 7, 20 (2008); *Munaf v. Green*, 553 U.S. 674, 689-90 (2008).

16       Before the *Winter* decision, the Ninth Circuit employed a "sliding scale" or

17   "serious question" test, which allowed a court to balance the elements of the test "so that a

18   stronger showing of one element may offset a weaker showing of another."  *See Clear Channel*

19   *Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003).  Recently, the circuit

20   court found that its sliding scale test survived *Winter*:  a court may issue a preliminary injunction

21   when a plaintiff raises serious questions going to the merits and demonstrates that the balance of

22   hardships tips sharply in its favor, so long as the court also considers the remaining two prongs

23   of the *Winter* test.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.

24   2011).

25   /////

26   /////

4

B.  Analysis

   1. The Products

      a.  Intensafire

Plaintiff has submitted evidence showing that, through its employee Steven Frazier and several independent contractors, it designed a gaming mod flexboard to use with "first person shooter games," which allows the game player to modify virtual weapon use; that the product became the Intensafire product on the market today; that computer code is imbedded in the chip used in the board; and that the code is protected from access and download by means of a key, which is controlled by plaintiff.  Declaration of Steven Frazier, ECF No. 57, ¶¶ 3-5 & Exs. A & B.  Plaintiff has provided Certificates of Registration of its copyrights in Intensafire's base form (TX-7-376-632) and its "active reload" form (TX-7-414-327).  *Id.* ¶ 10 & Ex. F; Supplemental Declaration of Steven Frazier, ECF No. 86 & Ex. 19.

Defendant Coy Christmas is President and CEO of BGRMods, LLC, Calibur11 LLC, and Einsteinmodz, LLC, all privately held companies.  Declaration of Coy Christmas, ECF No. 75-1 ¶ 1.  EinsteinModz distributes Intensafires.  ECF No. 57 ¶ 11; ECF No. 75-1 ¶¶ 1, 5.  EinsteinModz purchased Intensafires from BGRMods.  ECF No. 75-1 ¶ 5 & Ex. A.[2]

Although Christmas avers that each of his companies is separate and distinct from the other, plaintiff has produced evidence in the form of a declaration from its managing partner Bernadette Wyatt, suggesting that Christmas used the companies "interchangeably" in his and their dealings with plaintiff.  Declaration of Bernadette Wyatt, ECF No. 60 ¶ 9; Supplemental Declaration of Bernadette Wyatt, ECF No. 83 ¶ 2.  Wyatt avers, for example, that Christmas "paid invoices for any work done for any of these three companies using the same personal American Express card."  ECF No. 83 ¶ 2.  Once Christmas asked Frazier to modify some Intensafires and

---

[2]  Plaintiff objects to this portion of Christmas's declaration and the attached invoices, on the ground this information was not produced during injunction-related discovery.  ECF No. 87.  The court overrules these objections, as plaintiff has presented countervailing information about defendants' purchasing and payment practices.  *See* ECF No. 83 ¶¶ 2-3.

1   send them directly to EinsteinModz customers in California.  ECF No. 57 ¶ 11.  Wyatt billed

2   BGRMods for this work, at Christmas's direction.  ECF No. 83 ¶ 3.  In addition, in a June 26,

3   2011 email, Christmas explained entries on a balance sheet, showing that Einsteinmodz paid bills

4   for Calibur11.  ECF No. 86, Ex. 9.[3]

5           In July 2009, plaintiff and BGRMods entered into an Exclusive Reseller

6   Agreement, giving BGRMods the exclusive rights to promote and distribute plaintiff's flexboards

7   containing the object code version of the Intensafire software.  ECF No. 57 ¶ 8 & Exs. D-1 & D-

8   3; ECF No. 60 ¶ 4; ECF No. 75-1 ¶ 6.  The agreement prohibited BGRMods from using any of

9   plaintiff's intellectual property or attempting to reverse engineer the hardware or software, and

10  required BGRMods to cease distributing the products and return all master material and

11  confidential information relating to Intensafire upon termination of the agreement.  ECF No. 57,

12  Exs. D-3 & D-9.

13          Although the BGRMods agreement provided for a minimum order of 549,000

14  Intensafire units between September 2009 and August 2010, Christmas and BGRMods did not

15  meet this threshold and fell behind in payments in 2011.  *Id.* ¶¶ 11, 12.  On June 9, 2011, plaintiff

16  terminated the BGRMods agreement for non-payment and demanded that BGRMods stop selling

17  Intensafire products and return all confidential information, among other things.  *Id.* ¶ 12; ECF

18  No. 60 ¶ 6 & Ex. Y.  Christmas and BGRMods did not respond to the letter, but have continued to

19  sell Intensafires through EinsteinModz and additional websites.  ECF No. 57 ¶ 12; ECF No. 60 ¶

20  6.  According to Christmas, after the termination of the Reseller Agreement, he hired developers

21  to write new code for Intensafires and no longer sells products containing plaintiff's source code,

22  software or components.  ECF No. 75-1 ¶¶ 6-7.

23          In June 2011, Frazier visited Chinese manufacturer, Suntech Corp., Ltd., to set up

24  manufacturing for Game Vault.  During this visit, the manufacturing manager showed Frazier an

25  

26          [3] This document has been filed under seal pending resolution of defendants' motion to
    maintain the confidentiality of the documents.

1  Intensafire board and said Christmas had asked Suntech to reverse engineer the flexboard to build

2  a competing project.  ECF No. 57 ¶ 12.[4]

3        In late July 2011, plaintiff arranged for Debra Harrer to purchase an Intensafire

4  from Einsteinmodz and delivered it, unopened, to Wyatt, plaintiff's managing partner.

5  Declaration of Debra Harrer, ECF No. 59 ¶¶ 2b & 4; ECF No. 60 ¶¶ 1, 6.  Frazier then delivered

6  the Intensafire to Chris Tarnovsky, who specializes in the analysis of integrated circuits.  ECF

7  No. 57 ¶ 10; Declaration of Chris Tarnovsky, ECF No. 62 ¶¶ 2, 4.  Tarnovsky determined that the

8  source code contained in the Intensafire from EinsteinModz was an exact match to plaintiff's

9  Intensafire source code.  *Id*. ¶ 5.  The computer code embedded in the chips incorporated in the

10  Intensafire provided by plaintiff is object code only, protected from disclosure by an access

11  control encryption key, which plaintiff does not disclose.  ECF No. 57 ¶ 11.

12        Alex Golubev owns a gaming distribution business and was a distributor of

13  Intensafires, which he purchased from BGRMods.  Declaration of Alex Golubev., ECF No. 63 ¶¶

14  2-3.  In June 2011, he entered into an exclusive reseller agreement with plaintiff to distribute

15  plaintiff's improved flexboard product for the Intensafire.  *Id*. ¶ 4.  Golubev believes his efforts to

16  sell plaintiff's flexboard have been hindered by confusion in the marketplace over the ownership

17  of the rights to plaintiff's flexboard technology.  ECF No. 63 ¶ 4.[5]

18

19     [4] Defendants did not object to this portion of Frazier's declaration as double hearsay
until filing their supplemental brief, after hearing.  As noted in footnote 5 below, this court may

20  consider hearsay in resolving the pending motion.  The court finds Frazier's account of the
Suntech employee's statement sufficiently reliable, because Frazier avers the employee showed

21  him an Intensafire board.

22     [5] Defendants object to Golubev's claim that his customers appear reluctant to purchase
plaintiff's products, arguing that this portion of the declaration is speculative and based on

23  hearsay.  ECF No. 75 at 23.  Although a party may rely on hearsay in seeking a preliminary
injunction, *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009), in this instance Golubev

24  is not reporting what his customers told him, but rather speculating about the source of his
customers' resistance to plaintiff's new product.  *See* ECF No. 63 ¶ 4.  The court will not

25  consider this speculation.  However, the court does credit Golubev's belief that the existence of
defendants' Intensafire products in the market hinders his efforts to sell plaintiff's flexboard, as

26  this observation appears to be based on Golubev's established familiarity with the video game
industry.  *Id*. ¶ 2.

1          b.  Game Vault

2          In June 2010, Frazier, Christmas and Christmas's friend and business associate Sid

3  Garrand began to discuss an interactive casing product that would integrate with Microsoft's

4  popular Xbox 360 gaming console, providing light and sounds.  ECF No. 57 ¶¶ 13, 14.  The three

5  agreed to form a business called Calibur11 to produce and market their new product, which would

6  be called Game Vault.  *Id*. ¶ 14.  Because plaintiff owns Frazier's technology, Greg McCarry, one

7  of plaintiff's limited liability members, took over discussions with Christmas about the structure

8  of the business.  *Id*. ¶ 15; Declaration of Greg McCarry, ECF No. 58 ¶¶ 1, 3.  McCarry and

9  Christmas agreed on a partnership arrangement and the formation of Calibur11 as a new limited

10  liability corporation.  ECF No. 58 ¶ 3.  Over the course of the next several months, Christmas was

11  not forthcoming about the source of capital for the purchase of machinery, acquisition of licenses,

12  and production.  ECF No. 58 ¶ 5.  Even so, plaintiff went ahead with the development of Game

13  Vault.  ECF No. 57 ¶¶ 16-17; ECF No. 60 ¶ 8.

14          According to Christmas, he, Frazier and Garrand did discuss forming a partnership

15  to develop Christmas's idea for Game Vault during the E3 conference held in June 2010 in Los

16  Angeles.  ECF No. 75-1 ¶ 8.  Christmas offered Frazier 20 percent of the profits for vaults using

17  Frazier's electronics.  *Id*. ¶ 9.  Frazier's software was "full of glitches and bugs," however, so

18  Christmas hired a third party to fix them.  Even so, Calibur11 paid plaintiff $20,000 for the

19  electronics containing the reengineered source code.  *Id*. ¶¶ 3, 9 & Ex. B.

20          Frazier attended a gaming conference in September 2010, along with Christmas

21  and Garrand.  At the conference, Calibur11 secured a deal to produce a Game Vault for Major

22  League Gaming.  ECF No. 57 ¶ 19.

23          In October 2010, Christmas told a supplier that Frazier was his partner who

24  handled the engineering.  ECF No. 86, Ex. 3.

25          In December 2010, Christmas asked Frazier and Garrand to assign their interests in

26  the Calibur11 patents to "Calibur11, Inc."  ECF No. 58 ¶ 9; ECF No. 57 ¶ 18.  Frazier demurred,

8

1   asking for the paperwork relating to his interest in Calibur11.  *Id.*  Christmas said he was too

2   busy, but assured Frazier that he (and thus plaintiff) would get the 20 percent interest they had

3   discussed.  *Id.* & Ex. K.  Frazier then signed the assignment Christmas requested.  *Id.* & Ex. L.

4   Christmas avers that the 20 percent he mentioned was not an ownership interest in the company,

5   but rather 20 percent of the profits for Frazier's electronics.  ECF No. 75-1 ¶ 9.

6           When no paperwork was forthcoming, McCarry contacted Christmas, who sent an

7   updated financial pro forma with an assurance that a lawyer was working on the paperwork for a

8   corporation, not an LLC.  ECF No. 58 ¶ ¶10-11 & Ex. T; ECF No. 57 ¶ 20.  In reliance on these

9   promises, plaintiff gave Christmas the circuit board and computer code so he could manufacture

10  Game Vaults.  ECF No.  57 ¶ 20.

11          In early 2011, Christmas told Frazier that Calibur11 had received a license to

12  develop a Gears of War Game Vault.  *Id.* ¶ 21.  Frazier worked with plaintiff's programmer and

13  circuit board designer to develop a computer code and circuit board for the Gears of War 3 game.

14  *Id.*  Christmas suggested that Frazier transfer the manufacturing process of the MLG Game Vault

15  to someone else so Frazier could concentrate on developing the Gears of War3 Game Vault.  *Id.*

16  Frazier provided the MLG circuit board and computer code to Christmas, along with contact

17  information for the suppliers.  *Id.*  In March 2011, Christmas sold MLG Game Vaults to third

18  party distributors, including Walmart.  ECF No. 75-1 ¶ 10.

19          On May 16, 2011, McCarry sent Christmas a Memorandum of Understanding

20  regarding Calibur11.  ECF No. 58 ¶ 14 & Ex. 0.

21          On May 17 or 18, 2011, Wyatt asked Christmas about late payments for

22  Intensafire, concerned because the lack of payment was causing plaintiff financial distress.  ECF

23  No. 60 ¶ 9.  Christmas said there was no money in BGRMods, but he could send $20,000 from

24  Calibur11 to offset engineering costs; he asked for a Gears of War invoice for accounting

25  purposes.  ECF No. 57 ¶ 23; ECF No. 58 ¶ 15; ECF No. 83 ¶ 6.

26  /////

1    On May 20, 2011, Wyatt contacted Christmas again because the money had not

2  arrived.  She told him plaintiff would not send the Gears of War Game Vault if he did not sign the

3  Memorandum of Understanding McCarry had provided.  ECF No. 58 ¶ 16; ECF No. 57 ¶ 23.

4  Christmas called, saying he needed the Gears of War Game Vault for the next annual E3

5  conference in June; in a conference call with McCarry and Frazier, Christmas said plaintiff would

6  not get an ownership interest in Calibur, but would receive a 20 percent royalty from the sales of

7  Game Vaults.  ECF No. 58 ¶ 17; ECF No. 57 ¶ 23.  When McCarry and Frazier balked, Christmas

8  said the whole deal, and the promised payment of $20,000, was off if they did not send the Gears

9  of War 3 prototype.  ECF No. 57 ¶ 23; ECF No. 58 ¶ 17.

10    On May 22, 2011, plaintiff delivered a prototype Gears of War 3 Game Vault to

11  Christmas, with a goal of presenting the prototype at the E3 conference.  ECF No. 57 ¶ 22.

12    On May 27, 2011, plaintiff received a letter from a lawyer acting for Christmas.

13  This letter described plaintiff's relationship to Christmas as that of a service contractor; said that

14  any money plaintiff received was in the form of engineering fees; and said that plaintiff's share of

15  royalties was capped at $500,000.  ECF No. 57 ¶ 23 & Ex. P.  It denied that plaintiff had any

16  ownership interest in Calibur11 and demanded the remaining MLG and Gears of War

17  deliverables.  *Id.*

18    On June 6 and 7, 2011, plaintiff registered  copyrights, assigned numbers TX 7-

19  364-435 and TXu 1-739-688, for the MLG and Gears of War3 Game Vault codes respectively.

20  ECF No. 57 ¶ 25 & Ex. Q.  On June 8, plaintiff's counsel sent a letter to Christmas's lawyer,

21  demanding that Christmas and Calibur11 cease and desist from distributing MLG Game Vault

22  and Gears of War3 Game Vault codes.  ECF No. 57 ¶ 25 & Ex. R.

23    In July 2011, Harrer purchased MLG Game Vaults from Amazon.com,

24  Walmart.com and Gamestop.com.  ECF No. 59 ¶ 2 c-e.  In September 2011, Frazier purchased a

25  Gears of War 3 Game Vault from Fry's; the design of its circuit board as well as many other

26  features are the same as those developed by plaintiff.  ECF No. 86 ¶¶ 3, 5 & Ex. 18.

1    Tarnovsky examined each of these Game Vaults and found the source codes were

2  exact matches to plaintiff's.  ECF No. 62 ¶ 6; Supplemental Declaration of Christopher

3  Tarnovsky, ECF No. 85 ¶ 3.  To examine the source code in the Game Vaults, Tarnovsky used

4  heated fuming nitric acid to open the microcomputer unit and placed micro probing needles into

5  the security circuit of the device.  *Id*.; ECF No. 57 ¶ 30 (computer code in the Game Vaults

6  protected).  At the time of purchase of the units Tarnovsky inspected, the circuit design and board

7  for the Gears of War 3 Game Vault had not been publicly released.  *Id*. ¶ 31.

8    Christmas and Calibur11 have promoted the Game Vaults as their own products,

9  have not identified plaintiff's role in developing the product, and have not provided any payment

10  to plaintiff for sales of the product.  ECF No. 57 ¶ 26.

11    C.  Likelihood Of Success On The Merits

12    Plaintiff argues it has shown a likelihood of success on the merits of its claims for

13  copyright infringement, misappropriation of trade secrets, breach of the BGRMods agreement,

14  breach of fiduciary duty and conversion.[6]  The court finds plaintiff has established a likelihood of

15  success on the merits of its copyright infringement and misappropriation of trade secrets claims

16  and so does not address the remaining claims.

17    1.  Copyright Infringement

18    The Copyright Act gives a district court the authority to grant injunctions to

19  prevent or restrain copyright infringement.  *Flexible Lifeline Solutions v. Precision Lift, Inc*., 654

20  F.3d 989, 994 (9th Cir. 2011); 17 U.S.C. § 502(a).  A claim of copyright infringement has two

21  basic elements: (1) ownership of a valid copyright in the code alleged to have been copied, and

22  (2) copying of the protected elements of the code.  *See Apple Computer, Inc. v. Microsoft Corp*.,

23  35 F.3d 1435, 1442 (9th Cir. 1994); *Knowledgeplex, Inc. v. PlaceBase, Inc*., 2008 WL 5245484,

24  at * 9 (N.D. Cal. 2008).  A registration certificate is *prima facie* evidence of the validity of the

25    ───────────────

26    [6]  These claims are in the Second Amended Complaint, which is the operative complaint.
ECF No. 101.

1   copyright and of the facts stated in the certificate.  17 U.S.C. § 410 (c); *Meridian Project*

2   *Systems,Inc. v. Hardin Construction Co., LLC.*, 426 F. Supp. 2d 1101, 1111 (E.D. Cal. 2006).

3   Computer code, whether source or object code,[7] may be copyright protected.  *Sony Computer*

4   *Entertainment, Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000) (object code); *Johnson*

5   *Controls, Inc. v. Phoenix Control Systems*, 886 F.2d 1173, 1175 (9th Cir. 1989),  *impliedly*

6   *overruled on other grounds by Perfect 10, Inc. v. Google, Inc*., 653 F.3d 976, 979 (9th Cir. 2011)

7   (source and object code).  Plaintiff has presented evidence that it registered copyrights for two

8   versions of Intensafire code and two versions of Game Vault code.  Plaintiff's expert has found

9   the registered code identical to that of an Intensafire purchased from Einsteinmodz in August

10  2011 and also to that of Game Vaults purchased from several sources in August and September

11  2011.  *See Meridian Project Systems, LLC*, 426 F. Supp.2d at 1111.

12                  a.  Redesign

13                  Defendants argue generally that they have redesigned the code for the Intensafire

14  and Game Vault and notified plaintiff of this redesign in discovery and through Christmas's

15  declaration, ECF No. 75-1, filed in response to the pending motion.  They have provided no

16  evidence, but only the claim of redesign and an argument that the "object code in Defendants'

17  current products *must* differ from Plaintiff's copyright protected object code."   ECF No. 75 at 16

18  (emphasis in original).  These naked assertions are not sufficient to rebut plaintiff's showing that

19  the code in the purchased products matches its own code.

20                  b.  First Sale Doctrine and Authorized Sales

21                  Defendants make two additional arguments specifically directed to the Intensafire

22  claim.  First, they say that because of the reseller agreement with plaintiff, BGRMods is protected

23  _____

24      [7]  Each form of code is a set of instructions to the computer, but source code can be read
    by programmers while object code can be read only by machine.  *Sony Computer Entertainment,*
25  *Inc. v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir. 2000); *Silvaco Data Systems v. Intel Corp*.,
    184 Cal.App.4th 210, 217 (2010), *disapproved on other grounds by Kwikset Corp. v. Superior*
26  *Court (Benson)*, 51 Cal.4th 310 (2011); *see also Asset Marketing Systems, Inc. v. Gagnon*, 542
    F.3d 748, 756 n.5 (9th Cir. 2008).

from infringement by the first sale doctrine.  As plaintiff gave BGRMods only a license to promote and distribute the product, however, the doctrine does not apply.  *See* ECF No. 57, Ex. D-3 (granting BGRMods a license); *Apple, Inc. v. Psystar Corp*., 658 F.3d 1150, 1155 (9th Cir. 2011); 17 U.S.C. § 109(d) (doctrine does not apply when copy is transferred without a transfer of ownership).

Second, defendants argue that EinsteinModz was free to sell the Intensafires it purchased from BGRMods during the validity of the resell period, from June 2009 until June 2011.  Defendants have provided nothing in support of this argument but a single invoice showing that 435 Intensafires were sold to Einsteinmodz in May 2011; without more, the court cannot determine whether any of the units covered by the invoice were still in defendants' inventory in August 2011 when Harrer purchased the Intensafire from EinsteinModz.  Moreover, plaintiff has provided sufficient support for its allegation that the defendant companies all were alter egos of each other and of Christmas, which renders Einsteinmodz' possession of the Intensafire ineligible for the first sale doctrine.

c.  Implied License (Game Vault)

With regard to the Game Vaults, defendants argue that Calibur11 has an implied license to the initial code because Christmas asked Frazier to create electronics for the Game Vault, Frazier provided the board and code with the understanding defendants would distribute it, and Christmas paid over $20,000 for the technology.  They rely not only on Christmas's declaration, but also Frazier's description of developing the electronics to control the lighting on the mask and delivering the code to Christmas so he could demonstrate it at the E3 conference. ECF No. 57 ¶¶ 17, 22-23.

Plaintiff counters that there was no implied license because defendants repudiated the consideration, which was plaintiff's partnership interest in Calibur11; the $20,000 payment was not related to an implied license; and even if there was a license, it was terminated by plaintiff's counsel's June 8th cease and desist letter.

13

The Ninth Circuit recognizes that an implied nonexclusive license in copyrighted material is granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work. *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d at 754-55; *Effects Associates Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990). An implied license may be irrevocable if supported by consideration. *Carson v. Dynergy Inc.*, 344 F.3d 446, 451-52 (5th Cir. 2003).

Assuming for the purposes of this motion that the dealings between Frazier and Christmas created an implied license, defendants have not overcome plaintiff's showing that the consideration for any such license was an interest for plaintiff in Calibur11and that the interest was not forthcoming. Plaintiff also has shown that Calibur11's $20,000 payment in May was not for Frazier's work on the Game Vault but was in partial satisfaction of defendants' arrearage owing under the Intensafire agreement. Any implied license was therefore revocable and was in fact revoked, if not by plaintiff's letter of June 8, then by the filing of this lawsuit. *Carson*, 344 F.3d at 452.

2. Trade Secrets

A claim under California's Uniform Trade Secrets Act (UTSA) has three elements: (1) plaintiff owned a trade secret, (2) defendant acquired, disclosed or used the trade secret through improper means, and (3) defendant's actions damaged plaintiff. *Silvaco Data Systems v. Intel Corp.*, 184 Cal.App.4th at 220; *Wyndham Resort Development Corp. v. Bingham*, 2010 WL 2740158, at *4 (E.D. Cal. July 9, 2010); Cal. Civ. Code §§ 3426.1-3426.3. A trade secret is information that derives independent economic value from not being generally known to those who can obtain economic value from its disclosure or use, and is the subject of efforts to maintain its secrecy. *Silvaco Data Systems v. Intel Corp.*, 184 Cal.App.4th at 220; Cal. Civ. Code § 3426.1(d). Misappropriation of a trade secret includes acquisition of the secret by improper means; improper means include "theft, bribery, misrepresentation, breach or inducement of a

14

1    breach of a duty to maintain secrecy . . ." Cal. Civ. Code § 3426.1(b); *Spring Design, Inc. v.*

2    *Barnesandnoble.com, LLC.*, 2010 WL 5422556, at *6 (N.D. Cal. Dec. 27, 2010).

3           Plaintiff identifies its trade secrets as computer code imbedded in the Intensafire,

4    MLG Game Vault and Gears of War Game Vault, all protected from disclosure by encryption

5    keys, as well as the circuit design and board of the Gears of War Game Vault, which has not been

6    publicly released or distributed.  *See generally* ECF No. 57.

7           Defendants do not dispute that the code plaintiff identifies has economic value tied

8    to its secrecy, but argue that plaintiff has not shown a likelihood of success on the merits because

9    it has not identified the trade secret with sufficient particularity.  Defendants also argue that the

10   Gears of War Game Vault circuit design is publicly distributed, and the fact that the technology

11   could be reverse engineered shows the code is not a trade secret.[8]

12          It is true, as defendants argue, that a party claiming the protection of the UTSA

13   must identify its trade secret with particularity.  *Imax Corp. v. Cinema Technologies, Inc.*, 152

14   F.3d 1161, 1164-65 (9th Cir. 1998).  Plaintiff has identified the trade secrets as the computer code

15   for the three products at issue, as well as the circuit design and board of the Gears of War Game

16   Vault.  This identification is sufficient, tied as it is to particular products and components.

17   *Compare MAI Systems, Inc. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)

18   (identification not specific enough when plaintiff claimed only that software contained valuable

19   trade secrets).

20          Even though Christmas displayed the Game Vault at the E3 Convention, nothing

21   in his declaration shows that the circuit design itself was publicly displayed.  ECF No. 57 ¶ 31.  In

22   addition, the code for the Intensafire is protected by from access and download by means of a

23   key, which is controlled by plaintiff.  ECF No. 57 ¶ 5.  Although defendants allegedly have been

24   able to reverse engineer the code, plaintiff's expert has explained that to do so requires the use of

25

26          [8] Defendants also argue they had a license to the technology, but as noted, they have not
     supported this argument sufficiently with evidence.

1   sophisticated techniques informed by highly advanced reverse engineering experience.  ECF No.

2   85 ¶ 3.  In addition, plaintiff has required all the contractors who worked on these products to sign

3   non-disclosure agreements.  *See, e.g.*, ECF No. 57, Ex. A-3.[9]  These measures are sufficient to

4   show plaintiff's reasonable attempts to protect its trade secrets from disclosure.  *United States v.*

5   *Chung*, 659 F.3d 815, 825 (9th Cir. 2011) (referencing *MAI Systems*, 991 F.2d at 521)); *see also*

6   *Posdata Co. Ltd. v. Kim*, 2007 WL 1848661, at *5 (N.D. Cal. June 27, 2007).

7           D.  Irreparable Harm[10]

8           Plaintiff argues it will be harmed because defendants have claimed they have the

9   right to use plaintiff's technology; they have established significant relationships, using that

10  technology with Major League Gaming and Epic Gaming; that companies will be reluctant to

11  enter into a licensing agreement with plaintiff for technology they have already acquired from

12  defendants.  ECF No. 60 ¶ 13.  Plaintiff also avers its revenues have dropped significantly since

13  the beginning of 2011, because it has been unable to use its intellectual property.  *Id.*  In addition,

14  it is losing goodwill and sales as the result of the confusion in the marketplace.  *Id.*  Defendants

15  counter that throughout the litigation, plaintiff has been eager to settle, suggesting that financial

16  remuneration will be sufficient to compensate plaintiff for any injury.   However, defendants have

17  not provided authority for the proposition that eagerness to settle undercuts a showing of

18  irreparable harm.[11]

19

20           [9]  Plaintiff has provided a copy of a confidentiality agreement signed by Christmas on
    behalf of BragGame Rights in 2009 in connection with the Intesafire agreement.   ECF No. 57
21  ¶ 7 & Ex. C; Declaration of Bernadette Wyatt, ECF No. 60 ¶ 3.  The agreement identified the
    parties as Berster Technologies and Brag Game Rights, though there is a check-mark in the box
22  labeled "individual."   ECF No. 57, Ex. C-1.  Christmas signed for Brag Game Rights as "owner,
    president, CEO."  *Id.*, Ex. C-5.  Because plaintiff has not clearly shown the relationship between
23  this agreement and Game Vault or between BGR and the other entities, the court does not rely on
    it.

24           [10]  In light of *Flexible Lifeline Systems*, 654 F.3d at 995, the court rejects plaintiff's
25  argument that irreparable injury is presumed when infringement is shown.   ECF No. 56 at 21.

26           [11]  Similarly, at argument on the motion, defendants intimated that plaintiff's delay in
    seeking the injunction suggests that its alleged injury is not irreparable, but did not flesh out the

Monetary injury is not generally deemed irreparable harm. *Los Angeles Memorial Coliseum Commission v. National Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). However, "intangible injuries, such as damage to . . . goodwill qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). In addition to "lost or damaged good will," other intangible injuries include "lost business, lost business opportunities, lost economic value of protected previously confidential and proprietary information," *Daritech, Inc. v. Ward*, 2011 WL 2150137, at *2 (D. Or. May 26, 2011), the loss of opportunities to negotiate other license agreements, *Warner Bros. Entertainment, Inc. v. WTV Systems, Inc.*, ___ F.Supp.2d ___, 2011 WL 4001121, at *7 (C.D. Cal. Aug. 1, 2011), and consumer confusion. *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F. Supp. 2d 976, 988 (N.D. Cal. 1999).

Whether or not plaintiff seeks an injunction to use as a bargaining chip, it has shown it will suffer irreparable injury from the loss of goodwill and the inability to use its intellectual property completely. As it has shown, gaming companies will be reluctant to enter into agreements for products if they are unsure who owns the rights to the Intensafire and Game Vault technology and if they already have entered into agreements with defendants. Plaintiff has presented evidence that it devoted substantial efforts to developing the Game Vault technology, including dedicating most of Frazier's time to developing the product. ECF No. 57 ¶ 16. Without the ability to use its intellectual property, it will be unable to recoup this expenditure of time and talent. In addition, plaintiff is struggling to market its version of flexboard for first person shooter games because of defendants' claims to have developed the technology themselves. Plaintiff has

argument. This court may consider plaintiff's delay, but it is not controlling. *See Quince Orchard Valley Citizens Ass'n., Inc. v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989); *but see RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210-11 (10th Cir. 2009) (delay in seeking injunction "is but one factor in the irreparable harm analysis" and did not defeat issuance of injunction that permitted plaintiff to "participate in the everyday operations of its own interests"). Delay will not defeat an injunction when, as here, "a plaintiff . . . has taken additional time to examine the infringing product." *Weight Watchers Intern., Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144-45 (2d Cir. 2005). In this case, plaintiff pursued injunction-related discovery before filing the motion.

17

1   shown it is losing goodwill and business opportunities, sufficient to support a finding of

2   irreparable injury not adequately compensated monetarily.

3       E.  Balance Of Equities

4           Plaintiff argues that the potential destruction of its business tips the balance of

5   equities in its favor.  Defendants counter that BGRMods built Intensafire into a brand and secured

6   the trademark for the product.  ECF No. 75-1 ¶ 2.  They argue that an injunction will not change

7   the perception of Intensafire's source, given their ownership of the trademark.  They also argue

8   they have expended much time and energy in the development of Game Vaults and suggest,

9   without evidentiary support, that an injunction would put their three companies out of business

10  and "19 individuals on the unemployment line."  ECF No. 75 at 7.

11          The Ninth Circuit has said, however, that "a defendant who knowingly infringes

12  another's copyright 'cannot complain of the harm that will befall it when properly forced to desist

13  from its infringing activities.'"  *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 829

14  (9th Cir. 1997) (quoting *Triad Systems Corp. v. Southeastern Exp. Co.*, 64 F.3d 1330, 1338 (9th

15  Cir. 1995), *overruled on other grounds by statute as explained in Apple, Inc. v. Psystar*, 658 F.3d

16  at 1158-59)); *Warner Bros. Entertainment*, 2011 WL 40001121, at *9 .

17      F.  Public Interest

18          The public interest is served by the issuance of an injunction that upholds

19  copyright protections and thus prevents "'the misappropriation of skills, creative energies, and

20  resources which are invested in the protected work.'"  *Id.* (quoting *Apple Computer, Inc. v.

21  Franklin Computer Corp.*, 714 .2d 1240, 1255 (3d Cir. 1983)); *Priority Records LLC v.

22  Rodriguez*, 2007 WL 120033, at *6 (E.D. Cal. Jan. 11, 2007), *adopted by* 2007 WL 416093 (E.D.

23  Cal. Feb. 5, 2007).

24      G.  Bond

25          Plaintiff asks to be excused from the requirement of posting a bond.  Defendants

26  ask for a bond in the amount of $50,000,000, arguing this will be sufficient to protect them from

1  loss if it ultimately is determined the injunction should not have issued; they base this figure

2  solely on the damages plantiff seeks in the complaint.  ECF No. 75 at 30 (prayer for relief

3  includes $10 million-plus in general damages, double damages for willful trade secret

4  misappropriation, plus punitive, statutory and exemplary damages).

5          Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court

6  may grant a preliminary injunction "only if the movant gives security in an amount that the court

7  considers proper to pay the costs and damages sustained by any party found to have been

8  wrongfully enjoined or restrained."  The court retains discretion as to the amount of bond, if any,

9  but should consider the realistic likelihood of harm to an enjoined party when considering the

10  amount of the bond.  *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (no bond in Equal

11  Protection Clause case); *Johnson v. Couturier*, 572 F.3d at 1086 (sufficiency of bond should be

12  considered in context of injunctive relief granted).  The "bond amount may be zero if there is no

13  evidence the party will suffer damages from the injunction."  *Connecticut General Life Ins. Co. v.*

14  *New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).  Whether or not the amount of

15  bond would risk denying a party's access to judicial review may be a factor in the court's exercise

16  of its discretion.  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000).  "The

17  burden of establishing the amount of bond necessary to secure against the wrongful issuance of an

18  injunction rests with the defendant."  *TAP Worldwide LLC v. Becker*, 2010 WL 2757354, at *6

19  (N.D. Cal. July 12, 2010); *see also Doctor's Assocs. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)

20  (suggesting burden on defendant to support claim for bond).

21          Here, defendants have not presented evidence, but rather only arguments, about the

22  harm the injunction could cause.  Nothing in the record clarifies the percentage of defendants'

23  businesses that rely on sales of Intensafire and Game Vault or the profits that sales of the products

24  garner; no evidence supports the bare argument that employees will lose jobs if an injunction is

25  entered.  *Compare A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001)

26  (district court considered competing evidence in setting bond).  Christmas's declaration suggests

1   that in fact there will be no prospective harm, because defendants are not currently using or

2   distributing plaintiff's technology in any form.  *See* ECF 75-1, ¶¶ 4, 6, 7, 9.  On this record, the

3   court cannot find there is any evidence to support a requirement that plaintiff post a bond prior to

4   the injunction taking effect.

5   III.  <u>Motion For Reconsideration</u> (ECF No. 92)[12]

6          Plaintiff seeks reconsideration of Magistrate Judge Moulds' order of October 3,

7   2011, ECF No. 78, denying sanctions in connection with defendants' production of 14,000 pages

8   of electronic discovery in lieu of providing specific answers to Interrogatories 1, 2, 3 and 5.

9   Plaintiff acknowledges that the files are searchable, as Judge Moulds noted, but says that its

10  searching of the files still does not yield answers to the interrogatories.

11         Federal Rule of Civil Procedure 72(a) directs district judges to consider timely

12  objections to a nondispositive pretrial order issued by a magistrate judge and to "modify or set

13  aside any part of the order that is clearly erroneous or is contrary to law."  *See also* Local Rule

14  303(f); 28 U.S.C. § 636(b)(1)(A).  "'A finding is 'clearly erroneous' when although there is

15  evidence to support it, the reviewing [body] on the entire evidence is left with the definite and

16  firm conviction that a mistake has been committed.'" *Concrete Pipe and Prods. v. Constr.*

17  *Laborers Pension Trust*, 508 U.S. 602, 622 (1993) (quoting *United States v. United States*

18  *Gypsum Co.*, 333 U.S. 364, 395 (1948)).  "[R]eview under the 'clearly erroneous' standard is

19  significantly deferential . . . ." *Id.* at 623.

20         Defendants have offered to "provide, as ordered by the Court, designation of

21  documents by each Defendant, verification of interrogatories and a declaration of how the

22  searches were conducted."  ECF No. 95 at 2.  The court directs defendants to do so with seven

23  days of the date of this order, but otherwise declines to reconsider Judge Moulds' order.

24

25      [12]  This motion appears to duplicate the request for sanctions incorporated in plaintiff's
    briefing on its motion for preliminary injunction.  To the extent the request for sanctions in the
26  injunction briefing is a separate request, it is denied.

IV.  Motion To Seal

In light of the pending motion to retain confidentiality, the court grants the motion, without prejudice to plaintiff's renewing its objection to the sealing.  *See* ECF No. 102.

IT IS THEREFORE ORDERED that:

1.  The Motion For Reconsideration (ECF No. 92) is denied subject to defendants' providing the information described in the body of this order within seven days;

2.  The Motion To Seal (ECF No. 90) is granted pending resolution of the motion to maintain confidentiality; the Clerk of the Court is directed to seal the documents lodged in connection with ECF No. 81;

3.  The request for sanctions included with plaintiff's opening brief on its Motion for Preliminary Injunction (ECF No. 55) is denied; and

4.  The Motion for a Preliminary Injunction (ECF No. 55) is granted as follows:

Pending a trial on the merits, Defendants Coy Christmas, BGRMods LLC, Calibur 11 LLC and EinsteinModz LLC (collectively "Defendants") and their subsidiaries, affiliates, related companies, officers, agents servants, employees, attorneys, successors and assigns and all resellers, distributors and other persons previously acting, now acting, or acting in the future for, with, by, through, under, in active concert with or in participation with, any of them, and who receive actual notice of this injunction (collectively the "Enjoined Parties") are enjoined from:

a) making use of, manufacturing, disclosing, copying, reproducing, distributing, importing, exporting, displaying, performing, or making derivative works of any product design, computer code, circuit board, circuit designs, and other technology, physical specimen, or knowhow provided by Chip Connect (collectively the "Chip Connect Technology") to Defendants, or any of their

/////

/////

employees, agents or independent contractors, including, but not limited to:

　　　i) the gaming mod flexboard and computer code for

　　　all versions of the Intensafire product;

　　　ii) the circuit board design and computer code for the

　　　MLG Game Vault product;

　　　iii) the circuit board design and computer code for

　　　the Gears of War 3 Game Vault; and

　　　iv) any and all design features of the Game Vault

　　　products provided by Chip Connect, including, but

　　　not limited to, the chassis design, the chassis

　　　support, and features for cooling;

b) misrepresenting in any way that Defendants are the developers,

owners or creators of the Chip Connect Technology; and

c) engaging in any other activity constituting an infringement of

Chip Connect's copyrights in the software for the Intensafire, MLG

Game Vault and Gears of War 3 Game Vault, or any versions

thereof, including but not limited to any software covered by the

copyright registrations identified by the following numbers: TX

7-364-435; TXu 1-739-688; TX 7-376-632.

　　　Defendants also are hereby ordered to return to Chip Connect within seven (10)

days of the effective date of this order all Confidential Information of Chip Connect as that term

is defined in the Exclusive Reseller Agreement dated July 30, 2009 between Chip Connect and

Defendant BGRMods, LLC and the Mutual Confidentiality Agreement dated June 17, 2009

between Chip Connect and Defendants Coy Christmas and Brag Game Rights (n.k.a. BGRMods,

LLC) and to certify compliance with this order to the court under penalty of perjury within seven

days of returning the confidential material.

1    This order shall take effect immediately, without the requirement that plaintiff post

2    a bond.

3    DATED:  January 5, 2012.

5    _____
     UNITED STATES DISTRICT JUDGE